Slip Op. 14 - 82

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| SWIFF-TRAIN CO., METROPOLITAN HARDWOOD FLOORS, INC., BR CUSTOM SURFACE, REAL WOOD FLOORS, LLC, GALLEHER CORP. and DPR INTERNATIONAL, LLC, | : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | : : | Court No. 12-00010 |
| Defendant, | : : | |
| and | : : | |
| COALITION FOR AMERICAN HARDWOOD PARITY, | : : : | |
| Defendant-Intervenor. | : : | |

## OPINION

[Sustaining administrative material injury redetermination in antidumping and countervailing duty investigations of multilayered wood flooring from the People's Republic of China.]

Decided: July 16, 2014

*William E. Perry* and *Emily Lawson*, Dorsey & Whitney, LLP, of Seattle, WA, for the plaintiffs.

*Mary Jane Alves*, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for the defendant. With her on the brief were *Dominic L. Bianchi*, General Counsel, *Neal J. Reynolds*, Assistant General Counsel, and *Robin L. Turner*, Attorney.

*Jeffrey S. Levin*, Levin Trade Law, P.C., of Bethesda, MD, for the defendant-intervenor.

Musgrave, Senior Judge:  This opinion considers the *Remand Views*[1] of the U.S. International Trade Commission ("Commission" or "ITC") in response to Slip Op. 13-38, 37 CIT ___, 904 F. Supp. 2d 1336 (Mar. 20, 2013), addressing certain of the Commission's material injury determinations in the investigations of multilayered wood flooring ("MLWF") from the People's Republic of China ("PRC").[2]  Familiarity with that opinion is presumed.  Remanded were (1) the decision not to investigate domestic producers of hardwood plywood used for flooring, (2) findings on the issue of price suppression/depression, and (3) the impact the subject imports had on the domestic industry in light of the collapse of the housing market during the period of investigation.  Addressing those issues in its *Remand Views*, the Commission has again determined the domestic MLWF industry materially injured by reason of subject MLWF imports.  After hearing oral argument on the parties' comments on June 24, 2014, the court must conclude that the *Remand Views* comply with the orders of remand and sustain the material injury determination.

*Discussion*

I

On remand, the Commission reopened the record to solicit domestic MLWF production responses from 20 U.S. hardwood plywood manufacturers.  *See Multilayered Wood Flooring from [the PRC]*, 78 Fed. Reg. 30329 (USITC May 22, 2013) (solicitation of participation in remand proceeding).  Written comments on remand were limited to the remanded issues, interested parties to the original investigations who participate in the present action, and any new

---

[1]  PDoc 310R (Oct. 17, 2013), CDoc 555R (Oct. 18, 2013).

[2]  *See Multilayered Wood Flooring from [the PRC]*, Inv. Nos. 701-TA-476 and 731-TA-1179 (Final), USITC Pub. 4278 (Dec. 2011), PDoc 283 (Dec. 16, 2011).

information obtained by the Commission not through the comment process.  The Commission denied the request of the U.S. importers, plaintiffs herein, to release a draft producer questionnaire for comment, and the Commission here maintains that its definition of the domestic MLWF industry as investigated in the original investigations is supported by the record.  The court finds that to be the case.

The plaintiffs contend that the *Remand Views* are procedurally deficient, that as a matter of due process they should have been allowed to offer input into the tailoring of the questions posed to the domestic hardwood plywood producers upon the reopening of the record.  Pls' Comments at 7-8.  The Commission avers that it simply followed its usual approach for remands and that its rules do not require soliciting input on questionnaires issued during remand proceedings. Given the record and the parties' representations, the court cannot find procedural abuse of discretion in the Commission's interpretation of the remand orders and its undertakings thereon.

Substantively, the plaintiffs complain that the remand questionnaire issued to the domestic hardwood plywood producers was simply the same language that appeared in the original questionnaire issued to the domestic MLWF industry insofar as it included "just the domestic industry definition (*i.e.*, the scope definition)".[3]  Noting in their comments that the domestic hardwood plywood industry definition explicitly excluded certain hardwood plywood product that is subject to and covered by the MLWF orders, *i.e.*, hardwood plywood product that is "unfinished"

---

[3] *Cf.*, *e.g.*, scope definition for *Hardwood Plywood from [the PRC]*, Inv. Nos. 701-TA-490 and 731-TA-1204 (Final), USITC Pub. 4434 at I-7 (Nov. 2013) ("*Hardwood and decorative plywood* is *a flat panel* composed of an assembly of two or more layers or plies of wood veneers in combination with a core.  The *veneers*, along with the core, are glued or otherwise bonded together to form a *finished* product. . . .") (italics added) *with* scope definition for MLWF from the PRC.

MLWF or suitable for flooring and falls within the scope of the MLWF investigations, and emphasizing at oral argument that U.S. Customs and Border Protection has been "stopping" certain imports of hardwood plywood on the ground that it could be suitable for use as MLWF, the plaintiffs argue that the queried domestic producers of hardwood plywood may not have understood or appreciated the inclusiveness of what actually constitutes the scope of the domestic like product, *i.e.*, that the domestic hardwood plywood producers (or the Commission) may not have properly imputed "used for MLWF" when answering (or asking) the relevant question, and also that the Commission failed to properly ask or consider if their product "is suitable for that use."  Pls' Comments at 9.

On this point, the court must conclude the plaintiffs' contentions both speculative and in conflict with their previous argument on administrative exhaustion.  The prior opinion considered the plaintiffs' arguments into investigating potential "producers of the domestic hardwood plywood industry used for flooring as part of the domestic like product industry" sufficient for purposes of exhaustion, 37 CIT at ___, 904 F. Supp. 2d at 1340, and given the overlap in the definition of MLWF and hardwood plywood[4] the court deemed the Commission's explanation of why it had not investigated hardwood plywood suitable for use as MLWF flooring (*i.e.*, potentially "unfinished" MLWF) insufficiently responsive to the question posed by the plaintiff regarding the scope of the domestic MLWF industry.  *Id*. at ___, 904 F. Supp. 2d at 1342.  On remand, however, the Commission had discretion over what additional information to solicit from the identified domestic hardwood plywood producers in upholding its duty to take Commerce's determination on the scope of subject imports at face value in order to define the domestic like product.  *See*, *e.g.*, *Federal*

---

[4]  *I.e.*, because "plywood always has an outer veneer, and thus could fall within the scope's definition of MLWF".  37 CIT at ___, 904 F. Supp. 2d at 1342.

*Power Commission v. Transcontinental Gas Pipe Line Corp*., 423 U.S. 326, 333 (1976).  *Cf. USEC, Inc. v. United States*, 34 Fed. App'x 725, 730 (Fed. Cir. 2002) ("it is Commerce's investigation that defines the scope of the ITC's analysis").[5]  The plaintiff was provided the opportunity to comment on the original questionnaire and instructions at the outset of the investigation,[6] and in the instruction booklet accompanying the 30-page U.S. Producer Questionnaire issued in the remand proceedings (based upon the original MLWF industry questionnaire), the domestic like product definition is restated co-extensively with the scope of the investigations.  The questionnaire asked, *inter alia,* "Has your firm produced multilayered wood flooring (as defined in the instruction booklet) at any time between January 1, 2008 and June 2011?"  CDoc 556R (June 26, 2013).  For the purpose of answering, the questionnaire referred the recipient to the instruction booklet.

Despite the apparent overlap of hardwood plywood and MLWF in the scope definition of MLWF,[7] during the remand proceedings none of the 20 domestic producers of hardwood responded that they manufactured product used for flooring.  The plaintiffs do not explain why domestic hardwood plywood producers would be, or should be presumed to be, unknowledgeable regarding what constitutes either an "unfinished" MLWF product or a product

---

[5]  *Cf. id*.

[6]  *Cf*. CDoc 555R at 11 n.37, citing PDoc 298R (June 26, 2013) in noting that the Commission had considered the plaintiffs' "letter, the schedule for these proceedings, and information on the record of these proceedings".

[7]  *See*, *e.g.*, 37 CIT at ___, 904 F. Supp.2d at 1341-42.  The Commission's explanation was that "whereas the scope does not include hardwood plywood for flooring or the veneers peeled from plywood or logs, it does, for example, include as *unfinished* MLWF those products manufactured by pressing one or more layers of wood veneer to a hardwood plywood core that may or may not yet have a tongue and groove or click-and-lock profile, stain, and/or finish".  *Id*. at ___, 904 F. Supp. 2d at 1341 (bracketing removed, italics added).

suitable for use as MLWF (and "irrespective" of the actual uses to which their hardwood plywood

product are put[8]), nor do they explain why those producers as a whole[9] should be singled out, of

domestic like product, for special questionnaire treatment within the domestic MLWF industry.  The

court therefore finds that the Commission properly complied with the order of remand on this issue.

## II

The Commission was also asked on remand to make explicit its findings on the effect

of the subject imports on the price suppression/depression factors.  On remand, the Commission

found evidence that the subject imports depressed prices of the domestic like product, although it

did not find "significant" price suppression.  *See Remand Views* at 23.  The Commission based its

finding of price depression on the traditional pricing data for one pricing product as well as

supplemental pricing data, on purchaser questionnaire responses, and on confirmed lost revenue

allegations.  CDoc 555R at 19-20.  It found both traditional and supplemental pricing data showing

overall declines in domestic like product prices in the face of significant underselling by subject

imports from the PRC.  *Id*. at 31-32; CDoc507 (Oct. 27, 2011) at Tables V-1--V-8; CDoc 525 (Dec.

---

[8] The plaintiffs explain that since end-use certifications were not required for the subject imports, the actual use of the product is not a "defining characteristic" in the identification of the domestic like product, which is co-extensive with the scope language.

[9] The plaintiffs argue that two domestic hardwood plywood producers' denials of MLWF production conflicts with the record of their actual product.  *Cf.*, CDoc 482 (Oct. 4, 2011) at 5-9, n.11-20 & Ex. 3-9; CDoc 496 (Oct. 19, 2011) at 14-15 and n.38; CDoc 548R (July 12, 2013) at 6. The court cannot conclude, however, that the confidential information of record to which the plaintiffs point, and their interpretation of it, amounts to "more than a mere scintilla", *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), demonstrating that the Commission did not take into account "whatever in the record fairly detracts from its weight", *id.* at 487, in its definition of domestic MLWF industry and its determination not to include any member of the domestic hardwood plywood industry therein.

5, 2011) (majority views) at 44, n.202; CDoc 553R (Oct. 18, 2013).  Between 2008 and 2010, the

supplemental pricing data showed "overall declines in prices of the domestic like product for birch,

hickory, maple, oak, red oak, and walnut as well as overall declines in prices of the domestic like

product for birch products, hickory products, maple products, oak products, and walnut products."

CL555R at 20; CL525 at 44 n.202.  The Commission found further  "[e]vidence from purchasers'

questionnaires . . . indicat[ing] that domestic producers were forced to lower prices to compete with

low-priced imports of MLWF from subject producers in [the PRC]."  CL555R at 20 (citing CL525

at 45 n.204); CL507 at V-26-V-27 (seven of eight responding purchasers reported that domestic

producers reduced prices to compete with prices of MLWF from the PRC).  The Commission found

that purchaser confirmations of domestic producers' lost revenue allegations further demonstrated

that the domestic industry lowered prices due to low-priced imports of MLWF from the PRC.  CDoc

555R at 20; CDoc525 at 45; CDoc 507 (Oct. 27, 2011) (final staff report) at V-27, V-29.

       The plaintiffs argue that the Commission's analysis improperly emphasizes

traditional pricing data for one product.  The foregoing, however, indicates more than mere emphasis

on traditional pricing for one product.  As requested, furthermore, the Commission also addressed

the Dissenting Commissioner's analysis of the issue, CDoc 555R at 20-23, and the majority found

that the record showed "domestically produced MLWF faced competition from a large and growing

volume of substitutable MLWF that was lower priced and that the domestic industry lowered its

prices", *id*. at 19-20.  *See also* CDoc 525 at 44 & n.202; CDoc 553R.  In the case of hand-scraped

products, the Commission found that both the traditional and supplemental pricing data showed

nearly universal underselling of the domestic like product by subject imports, and that declines in

domestic like product prices exceeded any decline during this period in the cost of raw materials

used to manufacture MLWF.  The Commission concluded that the domestic industry's lowering of

its prices for these hand-scraped products by more than its cost declines demonstrated that these

price declines were not due to lower demand, the severe economic downturn, or fluctuating raw

material costs, but instead corresponded to the significant and significantly increasing volume of

low-priced subject imports.  CDoc 555R at 20, 32; CDoc 525 at 31, 40, 43-45 & nn.141, 149, 189,

200, 203-05; CDoc 507 at V-1, V-26--V-27, V-29, Table V-1; CDoc 553R at question 2.

        In the final analysis, substantial evidence in the record supports the Commission's

price effects analysis.  It, too, must therefore be sustained.[10]

---

[10]  In passing, the Commission contends that in situations where there has been significant underselling by subject imports, where this underselling has enabled subject imports to maintain and gain market share at the domestic industry's expense, and where a significant and significantly increasing volume of subject imports has adversely impacted the domestic industry, the Commission is not required to find that there also is significant price depression or significant price suppression. ITC Resp. to Pls' Comments on Remand Determinations at 18, referencing CDoc 555R at 17-18 & CDoc 525 at 34-54 (emphasis omitted).  The Commission explains that under the statute, a lack of price depression and/or price suppression does not preclude a finding of adverse price effects based on significant underselling, nor does it prevent it from making affirmative determinations if the significant underselling enables subject imports to maintain a significant volume in the U.S. market and/or to increase significantly.  *Id.*, referencing CDoc 555R at 17-18.  The Commission points out that since its finding of significant underselling by a significant volume of subject imports was sustained in the prior opinion, its price effects analysis should also be sustained on that basis.  *Id.* at 18-19 & n.21, referencing, *inter alia*, *U.S. Steel Group v. United States*, 96 F.3d 1352, 1364-65 (1996) (if substantial evidence supports the Commission's determinations as a whole they are to be sustained even if one or more findings are unsupported by substantial evidence), *Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996), & CDoc 555R at 17-18, 23. However, the precise issue of price depression and suppression was not apparently presented in *Grupo*, *see also* 18 CIT 461, 853 F. Supp. 440 (1994), and notwithstanding the Commission's position here, "[s]ection 1677(7)(C)(ii) requires the Commission to undertake two distinct analyses to examine (1) the significance of underselling and (2) the causal connection between subject imports and price depression and/or suppression", which are "two statutorily-mandated discrete inquiries". *Altx, Inc. v. United States*, 25 CIT 1100, 1109, 1110, 167 F. Supp. 2d 1353, 1365 (2001).  *See also*
(continued...)

### III

The court also remanded for fuller examination of causation in accordance with 19 U.S.C. §1673d(b), specifically with regard to "the effect that the severe disruption of the home building and remodeling industries had on the domestic like product industry" in the determination of whether subject imports were the material cause of injury.

### A

The *Remand Views* interpret that order as follows:

> We understand our burden under *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008), is to identify substantial evidence in the record demonstrating the domestic industry is materially injured by reason of subject imports notwithstanding any record evidence of other factors that might also be having adverse effects on the industry at the same time. While the type of analysis posited by respondents might be one way to conduct such an inquiry, the Federal Circuit has been clear in holding that the Commission has discretion in choosing its methodology for assessing causation and need not follow any rigid formula, such as that proposed by respondents. . . . Congress has delegated this finding to the Commission because of the agency's institutional expertise in resolving injury issues. . . . As the Federal Circuit also has made clear, since the statute does not define the phrase "by reason of," the question of whether the injury to the domestic industry by subject imports satisfies the material injury threshold notwithstanding any injury from other factors falls within the Commission's discretion and is reviewable under the substantial-evidence standard.

*Remand Views* at 33 n.142.

According to the plaintiffs, this statement demonstrates the Commission's determination to avoid the duty to undertake "but for" causation analysis, which is not simply a "type of analysis" they "posited" but a requirement under law. *E.g.*, Pls' Comments at 20, referencing

---

[10] (...continued)
*Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005). In any case, the Commission's clarification of its position on remand is helpful. *Cf. Altx, Inc. v. United States*, 370 F.3d 1108, 1117 (Fed. Cir. 2004).

*Mittal Steel*, *supra*, *Bratsk Aluminum Smelter v. United States*, 444 F. 3d 1369 (Fed. Cir. 2006), and

*Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997).

   The court disagrees with the plaintiffs' characterization in part.  The reference to

"type of analysis posited" refers to the "natural experiment"[11] the respondents proffered, not "but

for" analysis *per se*.  That appears plain from the Commission's expression of its discretion over

causation methodology for its findings of fact and from the reference to the reviewing standard of

"substantial evidence" on the record.

   The defendant-intervenor argues the Commission should not have been required to

perform a "but for" test of causation at all, since the cases upon which the plaintiffs rely all turned

on the fact that the subject imports were commodity products in markets also consisting of fairly

traded and price-competitive non-subject imports, and the Commission determined that MLWF is

not a commodity product.[12]  If "but for" methodology was in fact the functional equivalent of a

compulsory legal standard, it argues, the Federal Circuit would not have couched the mode of

analysis as a "not necessarily dispositive, but important" analytical framework.  Rather, the

defendant-intervenor argues the "controlling standard" of 19 U.S.C. §1516a(b)(1)(B) is whether the

"causative connection between subject imports and the condition of the domestic industry -- *i.e.*, the

'by reason of' portion of the statute -- is established by substantial evidence on the record and is

otherwise in accordance with law".  Def-Int's Comments at 7-9, referencing, *inter alia*, *Mittal Steel*,

---

[11]  The plaintiffs attribute the term to Commissioner Pinkert's characterization of the period from 2009 onward.  Pl's comments at 25, referencing PDoc 202 (Oct. 14, 2011) at 86-87.

[12]  A commodity product is one that is "generally interchangeable regardless of its source." *Bratsk*, 444 F.3d at 1371.

542 F.3d at 874-75.  *See* PDoc 283 at 5-6, 28-31, 33-34, 53.  This argument, however, does not appear to distinguish between the legal standard for cause-in-fact under 19 U.S.C. §1673d(b)(1), which is necessarily governed by the "in accordance with law" aspect of 19 U.S.C. §1516a(b)(1)(B)(i), and the "substantial" standard for the evidence necessary to support findings on cause-in-fact.  The court will attempt to clarify.

Broadly speaking, the Federal Circuit has interpreted section 1673d(b) as equivalent to the "substantial factor" test of causation-in-fact.  *See*, *e.g.*, *Mittal Steel*, 542 F.3d at 879 ("*Bratsk* . . . required the Commission to consider the 'but for' causation analysis in fulfilling its statutory duty to determine whether the subject imports were a *substantial factor* in the injury to the domestic industry, as opposed to a merely 'incidental, tangential, or trivial' factor") (italics added), quoting *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  "Substantial factor" analysis subsumes "but for" causation analysis, albeit with multiple acts and effects for consideration.[13]  Thus, "inquiry into 'but for' causation [i]s a proper part of the Commission's

_____

[13]  *See Restatement (Second) of Torts* §431 (1965); W. P. Keaton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on Torts* (5th ed. 1984) §41, p. 265; *see*, *e.g.*, *June v. Union Carbide Corp.*, 577 F.3d 1234, 1247 (10th Cir. 2009); *Shawmut Bank, N.A. v. Kress Assoc's*, 33 F.3d 1477, 1495 (9th Cir. 1994).  "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense' which includes every one of the great number of events without which any happening would not have occurred." Comments to §431.  In tandem, it will be noted that although "material" modifies the "injury" language of 19 U.S.C. §1673d(b) and not the cause-in-fact language (*i.e*, "by reason of"), *Mittal* and *Nippon* have effectively equated the "substantial" of "substantial factor" analysis with "material" with regard to injury.  *Cf.* 542 F.3d at 879 ("incidental, tangential, or trivial") *with* 19 U.S.C. §1677(7)(A) ("'material injury' means harm which is not inconsequential, immaterial, or unimportant").  That is consistent with the "substantial factor" test, which effectively melds cause-in-fact and legal or "proximate" cause into an encompassing analysis.  *See*, *e.g.*, *Restatement (Second) of Torts* § 431.  The court's prior opinion on the subject, *see* 37 CIT

(continued...)

responsibility to determine whether the injury to the domestic industry is 'by reason of' the subject imports." *Mittal*, 542 F.3d at 877.   In other words, if the Commission undertakes a proper "substantial factor" analysis and finds subject imports the legal cause of material injury, then the Commission has, perforce, necessarily determined that subject imports are the "but for" cause of injury.   But, the converse does not follow: if the record or its analysis is unclear as to a not-immaterial factor's impact on material injury, or if its consideration has been omitted altogether, then the legality of the causation analysis is thrown into doubt.  *See, e.g., Bratsk*.[14]  To that extent, at least, the plaintiffs were and are correct: a finding of cause-in-fact must express, at a minimum (and howsoever expressed), the fundamental sufficiency of a "but for" analysis.[15]  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (agency decisions of less than ideal clarity will be upheld if the agency's path may reasonably be discerned).

---

[13]  (...continued)
at ___, 904 F. Supp. 2d at 1347, was for a record that would reflect distinct analysis of both cause-in-fact and legal cause nonetheless.

[14]  Subsequent elucidation in *Mittal Steel* on *Bratsk* explained that "[a]n important element of the causation inquiry -- not necessarily dispositive, but important -- is whether the subject imports are the 'but for' cause of the injury to the domestic injury".  *Mittal Steel*, 542 F.3d at 876.  Such elucidation simply reflects the minimum required to support the legal sufficiency of any finding of cause-in-fact.  *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 240 (1989); *The Adeline*, 9 Cranch 244, 257 (1815).

[15]  It was for that reason that, although a decision on the Commission's finding that MLFW is not a commodity product was deferred and the finding on non-substitution of subject MLWF and other flooring products was sustained, *see* 37 CIT at ___ n.5 & ___ n.9, 904 F. Supp. 2d at 1342 n.5 & 1347 n.9, the matter was remanded, in order to address the plaintiffs' broader argument concerning the effect of demand elasticity on causation, and the tectonic shock of the recent Great Recession upon the housing market, as the prior views of the Commission did not appear to have made an adequate causal analysis in those respects, *see id.* at ___, 904 F. Supp. 2d at 1347-48.

In this matter, the Commission has properly framed the legal basis upon which to determine whether subject imports are the cause-in-fact of material injury, to wit, "notwithstanding any injury from other factors". That is an obvious expression of a "but for" cause-in-fact inquiry. *Cf. Mittal*, 542 F.3d at 879 n.2 (summarizing remarks of two former commissioners). The question then becomes whether the Commission has properly isolated subject imports and considered the impact of those other factors in context when reaching the conclusion that subject imports are a "but for" cause of injury. *See* 37 CIT at ___, 904 F. Supp. 2d at 1348.

B

On the methodological and factual sufficiency of the Commission's analysis, the plaintiffs argue the Commission has merely paid lip-service to "but for" causation. They contend their particular "natural experiment" data demonstrates the fallacies of the *Remand Views* on "but for" causation, even as they acknowledge that their argument invades to a degree the traditional realm of the fact finder. *See* Pls' Comments at 16 (the Commission "has discretion on how to apply the methodology to be used to determine whether the 'but for' causation standard is met").

The validity of methodology depends upon the circumstance of the particular fact to be proven. "[C]ourts must accord deference to the agency in its selection and development of *proper methodologies*", *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir.1999) (italics added), but that, of course, merely begs the question. In the general international trade context, methodology is reviewed depending upon type under either or both the "substantial evidence of record" and "in accordance with law" standard(s) of 19 U.S.C. §1516a(b)(1)(B)(i). An analytic construct drawn from a fact finder's *a priori* knowledge, for example, is generally reviewed for

reasonableness under the "in accordance with law" provision.  Methodological validity may also be

revealed from any "feedback" from the record or the parties, *e.g.*, in light of the reasonableness of

the conclusion to which the method leads when assessing the substantiality of the evidence of record

supporting or detracting from the conclusion, *i.e.*, the "substantial evidence" standard. *See generally*,

*e.g.*, *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363, 1368 (Fed. Cir. 2005); *Mid*

*Continent Nail Corp. v. United States*, 34 CIT ___, ___, 712 F. Supp. 2d 1370, 1377-78 (2010);

*Micron Tech., Inc. v. United States*, 19 CIT 829, 835-36, 893 F. Supp. 21, 30 (1995); *Ceramica*

*Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986).  Here, so long

as the method chosen reasonably addresses the "but for" question of causation relevant to the

material injury issue (*i.e.*, "by reason of"), the Commission's discretion over the method employed

will be sustained.  If the methodology is valid, then the question simply resolves to whether analysis

of the substantiality of the evidence of record supports the conclusion drawn.

1

The Commission found from the period of investigation ("POI") that

> but for the unfairly traded subject MLWF imports from [the PRC] in the U.S. market
> during the POI, the domestic industry would have been materially better off both
> during the housing market collapse and during the developing recovery that followed.
> On remand, we therefore affirm the conclusion that subject imports of MLWF from
> [the PRC] had a significant adverse impact on the domestic industry during the POI.

*Remand Views* at 47.[16]

---

[16]  The Commission further states that in accordance with the court's remand instructions,
it has evaluated in detail the impact of the subject imports on the domestic industry within the
context of the business cycle and conditions of competition that are distinctive to the affected
industry, and that the Commission specifically addressed the economic impact issues identified as
affecting the domestic like product industry in the Dissenting Views of the initial determination. *See*

(continued...)

This conclusion is drawn from findings on a number of factors: (i) subject imports and the domestic like product competed in the U.S. market primarily based on price; (ii) traditional quarterly pricing data indicated that subject imports of MLWF undersold the domestic like product throughout the POI; (iii) low-priced subject imports gained sales and market share directly at the domestic industry's expense; (iv) by underselling the domestic like product at significant margins while selling products that were highly substitutable for the domestic like product and competing in the same geographic markets and channels of distribution, subject imports were able to maintain a significant volume in both absolute terms and relative to consumption in the United States, increase significantly relative to domestic production, and capture significant market share from the domestic industry; (v) subject "low-priced imports of MLWF" have depressed prices of the domestic like product in the U.S. market; and (vi) such low-priced, directly competitive subject imports had a materially injurious impact on the domestic industry. *Id*. at 28-36.

More precisely, for the period January 2008-June 2011, the Commission found that demand declined by 9.2 percent but that the declines in many of the domestic industry's performance indicators generally exceeded the decline in demand and were indicative of the industry's poor performance. CDoc 555R at 43-44; CDoc 554R (Oct. 17, 2013) (noting, *e.g.*, that the domestic industry's U.S. shipments, production, net sales quantities, and net sales values declined substantially). Subject import market share increased significantly by underselling at significant margins and regardless of demand conditions. The subject imports' U.S. shipments declined overall, but the decline was significantly less than the decline in demand, indicating that subject imports were

---

[16] (...continued)
*Remand Views* at 43-46; *see also infra*.

able to significantly increase their market share of the U.S. market over the course of the POI.

Importantly, the Commission found that the domestic industry's loss of market share to unfairly

traded subject imports that significantly undersold the domestic like product throughout the POI was

not a function of any declines in demand.  CDoc 555R at 44; CDoc 525 at 35, 45, 48-49, 53-54.

Focusing on demand between 2008 and 2009, the Commission found that the

domestic industry's already poor condition worsened in 2009, as declines in the domestic industry's

2008 to 2009 performance indicator generally exceeded the 15.7 percent decline in demand between

2008 and 2009.  CDoc 555R at 44-45; CDoc 525 at 48-49; CDoc 554R (noting that the domestic

industry's U.S. shipments, production, net sales quantities and net sales values declined

substantially).  Subject imports' overall decline in U.S. shipments was less than the decline in

demand.  As a result, during this period of declining demand, subject imports had significantly

increased their share of the U.S. market.  CDoc 555R at 45 & n.198; CDoc 525 at 35, 48-49; CDoc

554R.  Accordingly, the domestic industry's loss of market share to unfairly traded subject imports

that significantly undersold the domestic like product between 2008 and 2009 could not be described

as a function of demand.  Thus, notwithstanding the demand decline between 2008 and 2009 and an

overall demand decline during the POI, subject imports from the PRC "had a material impact on the

domestic industry" during this period. CDoc 555R at 45; CDoc 525 at 49.

The Commission also focused on the relative effects of subject imports and demand

during the January 2009 to June 2011 period, and found that during this period some of the domestic

industry's performance factors indicated apparent U.S. consumption improvement but that they

generally lagged the overall improvement in market demand during a time when subject imports

continued to increase their market share by significantly underselling the domestic like product; that U.S. consumption apparently increased 7.8 percent between 2009 and 2010, but that the domestic industry's U.S. shipments of MLWF and net sales quantity increased only marginally and its net sales value actually declined. CDoc 555R at 45-46 & n.204; CDoc 525 at 46-54; CDoc 554R. The domestic industry disproportionately bore the burden of economic downturns during these periods, did not share proportionately in market improvements, consistently suffered losses and experienced steep employment and wage declines. General market demand conditions did not adequately explain the changes in the domestic industry's indicators at the end of the POI. CDoc 555R at 46.

The Commission further concluded that the apparent improvement in the domestic industry's negative performance at the end of the POI was due less to enhanced sales related to a general economic recovery than to the "severe measures" the domestic industry undertook to remain competitive in the face of significant low-priced subject imports. Specifically, the Commission found that the domestic industry's apparent financial improvements were driven in large part by partial abandonment of domestic production in favor of low-cost subject imports, asset impairments, and significant SG&A cost cutting while operating at low capacity. The domestic industry slashed SG&A expenses, decreased its unit cost of goods sold, undertook asset impairments, laid off workers, and actually furthered the increase in subject imports from the PRC. The financial data also reflected the benefit but not the cost of such partial production abandonment. CDoc 555R at 46-47 & n.207; CDoc 525 at 47-54. Thus, the Commission found that the decline in the domestic industry's financial losses at the end of the POI did not "sever" any causal connection between the domestic industry's condition and subject imports. CDoc 555R at 47; CDoc 525 at 49-52.

2

The plaintiffs argue the Commission's "but for" methodology is legally unsupportable, and they complain they are being "penalized for the collapse in demand that occurred in 2008." They allege the Commission disregarded the data of the "natural experiment" of the period 2009 through the end of the POI, June 2011, to which they pointed on remand and during the investigation; and they argue their submission thereon in its own right proves the Commission's causation analysis is irrational. *See*, *e.g.*, Pls' Comments at 20.

The plaintiffs contend the "natural experiment" data shows the following (court's omissions here of citations to the administrative record): (i) shipments to the U.S. market of both the U.S. like product and subject imports increased; (ii) flooring demand in the United States substantially stabilized or declined only slightly (albeit at a level far below 2008 and earlier years, which the plaintiffs contend provides an unfair comparison); (iii) U.S. producer prices for U.S. shipments overall were essentially flat, fluctuating very modestly, but ending the period effectively where they began; (iv) U.S. industry performance, including shipments and profitability, improved sharply, in that the industry's operating income margin improved by 3.4 percentage points from 2008 to 2009, and by 2.1 percentage points from interim 2010 to interim 2011. Pls' Comments at 25-26. The plaintiffs contend that the difference between observed industry performance during the POI and this "counterfactual state" is what constitutes the "legally cognizable" effects on the U.S. industry that are "by reason of" the subject imports, and that the Commission must determine the extent to which, in order to properly determine whether, they are materially injurious. They contend their effort relies "in full" on all of the pricing data submitted through the original U.S. Producers'

Questionnaires, and they accuse the Commission of "cherry picking" that fails to consider the administrative record as a whole,[17] with especial reliance on "product 7" in which underselling occurred "to support a biased analysis of pricing." *Id.* n.16.  "Thus, even if imports have not had an adverse impact overall, prices of imports of some products may be below U.S. producer prices, or declining in relation to those prices -- as long as prices of imports of other products are above U.S. producer prices or increasing." *Id*.  The decline in U.S. producer prices from 2009 onwards was not the result of increased subject imports or due to increasing demand, they contend, because flooring demand generally declined only slightly during this period.  If imports affected prices during a period of stable-to-declining demand, they continue, then an increase in subject import sales in the U.S. market would necessarily have resulted in lower U.S. prices.  The only other possible analytic explanation, according to the plaintiffs, is that U.S. demand for MLWF is highly elastic (*i.e.*, geometrically corresponding to a flat or horizontal demand curve that "locks down" price within relevant ranges of volume sold), and such elasticity, they argue, effectively "insulated" domestic MLWF producers from the effect of increased imports.

Continuing, the plaintiffs acknowledge that in the original final determination the Commission challenged the theory that a high demand elasticity for MLWF is consistent with the ability and willingness of consumers to substitute one kind of flooring product for another based on

---

[17] "A reviewing court must consider the record as a whole, including that which 'fairly detracts from its weight', to determine whether there exists 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951)).  The plaintiffs argue that a pricing index that makes full and symmetric use of all the prices submitted by U.S. producers would reveal deficiency in the present investigation, and they imply theirs is such an index.

price incentives.  *See* PDoc 283 at 27, 48, CDoc 525 at 27, 48.  But, they argue, elasticity does not

depend upon substitution, as indicated by the fact that increased sales of MLWF from 2009 onward

"did not reduce" U.S. producers' MLWF prices overall despite the flat to slightly declining U.S.

demand.  Because substitution among flooring products is incidental to their elasticity point, they

contend, the Commission never directly rebutted the reasoning by challenging any of the four facts

on which their analysis depends.  As additional support, they point to the Commission's observation

in the hardwood plywood investigations that "we do not find that the record shows a significant

negative correlation between subject imports and the industry's condition, much less a causal

relationship", Pls' Comments at 27, referencing *Hardwood Plywood from [the PRC]* (Investigation

Nos. 701-TA-490 and 731-TA-1204 (Final)) at 25, and the plaintiffs contend the same is true in the

MLWF investigations for the period from 2009 onwards.

   The plaintiffs therefore request that the court reconsider finding that the

Commission's conclusion that MLWF did not displace non-MLWF flooring products is supported

by substantial evidence, arguing that the Commission's stated reasoning is based on a "palpable

inaccuracy" in characterizing the factual record.[18]  They argue the table relied upon by the

Commission shows that the market share of MLWF among all flooring products increased by 0.1

percentage point (from 1.6 percent to 1.7 percent of the U.S. flooring market) between 2008 and

2010, contrary to the Commission's assertion that the share was "stable" over this period, with the

gain actually occurring between 2009 and 2010 as U.S. sales of MLWF by both importers and U.S.

---

[18] *I.e.*, the Commission stated in its original final determinations: "We find no evidence that substitute flooring products took sales from MLWF during the period of investigation; MLWF products accounted for a steady share of sales of all flooring products between 2008 and 2010." PDoc 283 at 27, CDoc 525 at 27.

producers increased after having remained "stable" at 1.6 percent from 2008 to 2009 as overall

flooring demand declined due to the housing collapse.  They contend that while 0.1 percent appears

small, it represents the increased share of MLWF sales within the entire U.S. flooring market:

> Based on total flooring sales in 2009, for instance, 0.1 percent of the market amounts
> to approximately 17,493,400 square feet (derived from Final Staff Report, C.R. 507
> at II-12, Table II-4 (Oct. 27, 2011)/P.R. 235 at II-12, Table II-4 (Nov. 2, 2011))
> whereas the increase in U.S. sales of MLWF over this period amounted to
> 22,291,000 square feet over this same period.  *Id*.  In other words, the increase in
> MLWF's share of the U.S. flooring market from 2009 to 2010 was roughly similar
> in magnitude to the actual increase in MLWF sales over that year, based on the same
> data and mode of reasoning that the ITC employed.  This rough equivalency cannot
> support the ITC's conclusion regarding substitutability.

Pls' Comments at 27-29 n.19.

           The plaintiffs argue for re-visiting this "factual error" regarding substitution of

flooring products, contending that the Catalina Research data on which the Commission has relied

is in no way inconsistent with MLWF displacing other non-MLWF flooring products.  *Id*.,

referencing CDoc 548R at 17-19; CDoc 550R; PDoc 303R at 17-19 (July 15, 2013).  Pointing to the

*Remand Views*' segregated discussion of the collapse-year 2008 and the conclusion that subject

imports caused injury because "[t]he declines in the domestic industry's performance indicators

between 2008 and 2009 . . . generally exceeded the 15.7 percent decline in demand", the plaintiffs

argue such a "summary conclusion" of the economic impact issues is not a valid part of a full "but

for" analysis because the fact that MLWF constitutes just 1.6 percent of the broader U.S. flooring

market immerses MLWF in a "sea" of other potentially substitutable flooring products and reinforces

the independent conclusion that MLWF demand must be highly elastic, since basic principles of

microeconomics establish that demand tends to be more elastic in the presence of potential substitutes.

More broadly, they contend the Commission has confused U.S. consumption with demand. They argue demand "certainly" fell by more than 15.7 percent during 2008, because housing starts, which in January 2008 had stood at a seasonally-adjusted annual rate of 1.1 million units, by January 2009 had declined by 55 percent to just 0.5 million units. By contrast, they argue, consumption dropped by less than the fall in demand, principally because (they further contend) of increased purchases of MLWF at the expense of other flooring products induced by variations in relative price among the various products. They argue this "confusion" on the part of the Commission is evident elsewhere in the remand determinations, for instance at page 45, footnote 202, of the *Remand Views* where the Commission cited increasing U.S. consumption from 2009 onwards as evidence of increasing demand. Their point, however, is that the Commission has never contested record evidence showing that the drivers of demand downstream (housing starts and remodeling/renovation activity, from which demand for flooring is derived) both declined modestly over the relevant periods. *See Remand Views* at 45 n.202.

The plaintiffs argue housing starts that determine MLWF demand in early 2009 "must be counted from mid- to late-2008, since flooring is among the last products installed in a new home, and homes take a number of months to construct." Pls' Comments at 23 n.12. They point out that the Commission quoted them as arguing that "but for" injury could only have occurred in the face of increased supply from 2009 onwards if "demand for MLWF increased to absorb the increased supply, resulting in unchanged pricing." *Id*., referencing *Remand Views* at 45 n.202 (citing PDoc

303R at 15, CDoc 548R at 15; CDoc 550R). Therefore, the plaintiffs contend, it is clear that they

were and are distinguishing between increases in supply and increases in demand by noting that

supply increased.  The plaintiffs argue that "[n]aturally, both an increase in *supply* or demand could

*result in* increased U.S. consumption, which is why separate indicators of demand, such as

downstream drivers (housing starts and renovation/remodeling activity) are needed to distinguish

these two possibilities."  *Id*. (court's italics).  "The ITC's confusion is stark since it cited the

increased consumption as evidence of increased demand, without reference to any facts that

distinguish supply changes from demand changes."  *Id*. at 24 n.12.  The plaintiffs also find no

probative value in the Commission's comment that "[a]lmost all of the domestic industry's

performance indicators declined significantly from 2008 to 2009, and even those factors that

improved somewhat between 2009 and 2010 remained at lower levels in 2010 than in 2008."  Pls'

Comments at 22-23, referencing *Remand Views* at 33-34.  That is, they perceive no significance from

the fact that the industry's performance indicia of housing starts and remodeling activity had not

recovered to levels at or near the beginning of the POI following their collapse through the end of

2008 and into early 2009.  *See* PDoc 235 at II-7 (Nov. 2, 2011) (public final staff report), CDoc 507

at II-7.  The plaintiffs also take issue with a similar statement regarding MLWF pricing, whereby the

Commission noted that "the traditional quarterly pricing data show lower prices of the domestic like

product at the end of the POI than in the first quarter of the POI."  *Remand Views* at 31.

 The plaintiffs contend, then, that even if, hypothetically, the Commission had rejected

their proffered "but for" analysis based on some source of "substantial evidence" sufficient to satisfy

judicial review, the Commission  would still be required to offer its own "but for" analysis, which

they contend it continues not to do.  They also take issue with the Commission's rationale that the

domestic industry's apparent recent financial improvements were driven in large part by "partial

abandonment of domestic production capacity in favor of low-cost subject imports, asset

impairments, and significant cost-cutting of SG&A expenses while operating at low capacity

utilization." *Remand Views* at 46 (footnote omitted).  This point, the plaintiffs claim, serves only to

underscore that the Commission is not analytically constructing a counterfactual state of the

industry's condition and diverts attention from the fact that increased U.S. shipments of subject

imports from 2009 onward did not impair the industry's ability to capture its cost-rationalization

benefits in the form of higher profits, because imports did not, they claim, "result in" lower U.S.

producer prices.  "Prices are the nexus where competition plays out -- not costs", the plaintiffs

emphasize:

> Cost rationalization, *i.e.*, closing high-cost, obsolete capacity, . . . is commonplace among many industries that seek to right-size in the wake of a recession.  Because the housing collapse was even more severe than the general decline in business activity throughout the broader economy, it is even more likely that upstream industries that serve housing would use the demand crisis as an opportunity to rationalize costs. . . . [D]espite closing obsolete capacity, the industry as a whole actually increased U.S. shipments from 2009 onwards so the loss of this capacity did not constrain sales.  In summary, . . . increased sales of subject imports are not responsible for the industry's decision to improve its structure through cost rationalization efforts, [and] the lack of effect of the imports on U.S. producer prices was important in the industry's ability to pocket these savings in the form of higher operating margins achieved after 2009.

Pls' Comments at 29-30.

3

Despite the quality of the arguments the plaintiffs propound, the court cannot conclude that the *Remand Views* are unsupported by substantial evidence on the record or not in accordance with law.

The plaintiffs assert that the Commission should have focused its causation analysis on the January 2009-June 2011 period rather than the entire POI and assigned "no probative value" to the fact that the domestic industry's performance indicators were lower in 2010 than in 2008, because its prices at the end of the POI were lower than in 2008, and that between January 2009 and June 2011 demand "substantially stabilized," shipments increased, the domestic industry's prices were flat, and the domestic industry's operating margins improved.   The Commission rejected the plaintiffs' request on remand to emphasize the shorter POI period of January 2009-June 2011, because it found no basis to deviate from its normal practice of considering data for the three most recent calendar years plus applicable interim periods.  *See* CL555R at 44 n.195.  The court cannot find that the decision not to emphasize a shorter POI period was an abuse of its discretion.

In accordance with the orders of remand, the Commission evaluated the effect that the severe disruption of the home building and remodeling industries had on the domestic like product industry in determining whether subject imports were the material cause of injury, and in addition to the full POI, the Commission assessed the relative effects of demand and subject imports during 2008-2009 and during January 2009 to June 2011, the periods the plaintiffs' brief emphasized.  By doing so, the Commission appears to have adequately refuted the plaintiffs' claims

that data for these periods established that there was no causal link between subject imports and the material injury to the domestic industry.

The court further disagrees that the Commission has confused the demand analysis. The Commission used U.S. consumption as a statistical proxy for demand, as it routinely does, *see*, *e.g.*, *Shandong TTCA Biochemistry Co., Ltd. v. United States*, 35 CIT ___, ___, 774 F. Supp. 2d 1317, 1323-24 (2011), and the statute specifically instructs the Commission to consider whether the volume of subject imports relative to "consumption in the United States" is significant. 19 U.S.C. §1677(7)(C)(i). Given the consistency of the data therefor with other indicators, reliance thereon was not unreasonable. Further, an increase in supply does not "result in" an increase in demand, and the court declines to interfere with what the Commission regards as the relevant indicia for properly determining what drives demand for MLWF, and when it is driven.

Furthermore, the hypothetical the plaintiffs propose as "but for" causation analysis is not dispositive on that issue  -- of what the domestic MLWF industry *would have* experienced in the absence of imports of subject merchandise. The court previously disagreed "that the statute in conjunction with our appellate precedent requires . . . [ ]strict application of the 'but-for' causation standard to a particular factual scenario". And the court's function here does not involve reweighing the facts. *See*, *e.g.*, *Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006). If it did, the process would necessarily as well involve consideration of the defendant-intervenor's proposed quantified analysis of "what the world would look like without subject imports' continual gains in market share", which it submitted in the underlying investigation and in its comments for the remand proceedings, in which the defendant-intervenor concluded as follows:

> . . . [O]ne can observe the injurious impact of the growth in subject import market share incremental to the injurious impact of the recession by assuming that the domestic industry held its pre-housing market crisis market share throughout the remainder of the POI.  Any injurious impact of the recession would be shown by the decline in profitability associated with the adverse changes in the MLWF market overall. The difference between domestic producers' profitability when holding a constant market share and as actually observed is attributable to the injurious volume effects of subject imports.
>
> We note that the income statement analysis model considers only the market share lost to subject imports, and takes no account of the price effects caused by subject imports. That is, if domestic industry were able to hold its prices, and its average net sales value did not decline over the POI, its profitability would have been even stronger. Thus, the incremental injury caused by subject imports was almost certainly greater than the substantial figures shown in the scenarios above.

*E.g.*, PDoc 304R (July 22, 2013).  And it is well-established that the possibility of drawing two inconsistent conclusions from the evidence does not preclude the Commission's remand determinations from being supported by substantial evidence in any event.  *See*, *e.g.*, *Thai Pineapple Public Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999).

The plaintiffs' broad attack is that the Commission has not articulated a rational basis to find the subject imports had a material impact on the domestic industry, that the Commission's causation analysis remains unsupported, and that in fact that there is no causal connection between subject imports and the domestic industry's condition for the latter portion of the POI.  They contend that what the Commission has done in its *Remand Views* cannot be assessed, because nowhere do those views purport to describe the condition of the industry absent "unfair" competition by subject imports, or describe how the Commission has analyzed record evidence to reach conclusions about the "but for" condition of the industry, at least as contended by the plaintiffs.

The court must again disagree.  The Commission need not state for the record the precise contours of the hypothetical counterfactual "but for" state, so long as its ultimate conclusions, on causation "by reason of" subject imports from the evidence of record, are discernable and reasonable. *Cf. NSK Corp. v. U.S. Intern. Trade Comm'n*, 716 F.3d 1352, 1368 (Fed. Cir. 2013) (the fact that numerous facts of record detract from the Commission's conclusion, including the fact that non-subject imports "had a significant presence in the domestic market" and were sold at lower prices than domestic like product, did not detract to such an extent that the court may conclude the Commission's determinations unsupported by substantial evidence).  As indicated above, following a rather thorough analysis of the issue to identify and isolate the effects of subject imports, the Commission on remand concluded that "but for the unfairly traded subject MLWF imports from [the PRC] in the U.S. market during the POI, the domestic industry would have been materially better off both during the housing market collapse and during the developing recovery that followed." CDoc 555R at 47.  The Commission therefore reaffirmed its conclusion that subject imports of MLWF from the PRC had a significant adverse impact on the domestic industry during the POI.  The Commission found the domestic industry disproportionally suffered not only during the market collapse but also in the period that followed as the direct result of unfairly priced subject imports.

The plaintiffs complain that "increased sales of subject imports are not responsible for the industry's decision to improve its structure through cost rationalization efforts", but that in turn does not take into account what would have been the "counterfactual state" of how the domestic industry would have fared in the absence of unfairly priced subject imports, *i.e.*, the plaintiffs contentions in general also do not take into account the Commission's finding of widespread

underselling throughout the POI that enabled subject imports to capture market share from the domestic industry.  CDoc 555R at 34-35.  Despite their emphasis on demand "stabiliz[ation]" and domestic industry performance "improvement" from 2009 onward, Pls' Comments at 26, the fact that the plaintiffs offer an alternate explanation of the record evidence does not undermine the Commission's reasoned analysis.  *See NSK Corp.*, *supra*;  *Matsushita Elec. Ind. Co., Ltd. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).  The Commission found that the domestic industry lost a significant percentage of market share from 2009 to 2010 and also continued to suffer disproportionately between interim 2010 and interim 2011 as subject imports' U.S. shipment volumes significantly outpaced growth in demand during these periods.  *Remand Views* at 35 & n.34, referencing CDoc 555R at 45-46 & n.204,  CDoc 525 at 46-54l, CDoc 554R.  And the plaintiffs conceded that it is "conceivable that the U.S. industry would have performed even better but-for the increase in subject import shipment volume".  CDoc 548 at 15.

Even accepting the plaintiffs' broader economic argument, it is difficult to envision what further "cost rationalization" measures, in order to "compete" against "significant underselling" of subject imports from 2009 onward even after the collapse of the housing market, could reasonably be compelled from the domestic MLWF industry before the Commission, having identified the harm summarized above, may reasonably reach the determination that material injury to the domestic industry has occurred "by reason of" those imports.  A cause-in-fact analysis from the Commission exacted to that extent would either be superfluous or antithetical to the purposes of the antidumping law and the function of judicial review of administrative determinations made pursuant thereto.  *See NSK Corp.*, *supra*.

In passing, the court here declines to give more than cursory comment on the plaintiffs' June 6, 2014 letter, docketed as "notice of supplemental authority" to apprise of *Baroque Timber Industries (Zhongshan) Co. v. United States*, 38 CIT ___, 971 F. Supp. 2d 1333 (2014). The *status quo* for the time being is apparently an affirmative determination of less-than-fair-value sales notwithstanding that the three mandatory respondents of that antidumping duty case now apparently have administratively-determined margins of zero, and it is also apparently affirmative in the countervailing duty determination before Commerce where one of three mandatory respondents was determined to have received a 1.5% subsidy. As the Commission rightly objects, this does not present the kind of *Borlem* circumstance that would compel the Commission to reconsider the present disposition of  this matter as reflected in its *Remand Views*. *See Borlem SA-Empreendimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012) (noting "small number of exceptions" for agency record supplementation).

### Conclusion

For the foregoing reasons, the *Remand Views* will be sustained. Judgment will enter accordingly.

**So ordered.**

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: July 16, 2014
       New York, New York